

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-09-00413-CV
### NO. 02-09-00414-CV

ELIZABETH ANN DAVIS CREWS                                    APPELLANT

V.

GARY M. GORDON D/B/A                                            APPELLEE
GORDON TAYLOR CUSTOM
HOMES

----------

## FROM THE 141ST DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

Appellant Elizabeth Ann Davis Crews challenges the legal and factual sufficiency of the evidence to support the jury's findings in favor of Appellee Gary M. Gordon d/b/a Gordon Taylor Custom Homes. We will affirm.

---

[1]See Tex. R. App. P. 47.4.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Gordon has been a custom and speculative homebuilder for thirty years.[2] In June 1999, he contracted with Crews to build her a house. Crews moved into the house sometime in early 2000, but there was a "punch list" of "small items on the house, touch ups, fix ups and so forth" that needed to be completed. Gordon claimed that he performed the repairs, sometimes two or three times, spending about $55,000 in "extras" for which he was never reimbursed, but Crews was never satisfied with his efforts.[3] Crews eventually sued Gordon in September 2000 for, among other things, breach of contract, fraud, and violations of the DTPA in relation to the construction of her house, and Gordon asserted a counterclaim against Crews for monies owed to him.[4]

Crews and Gordon mediated the lawsuit on July 28, 2003. That same day, they entered into a "Compromise and Settlement" agreement (CSA) that contained the following terms:

1. [Gordon] shall pay [Crews] the sum of $33,000.00 at closing.

. . . .

---

[2]Gordon described his business as "[e]xtremely" financially risky. He generally builds homes costing at least $1 million, and when he builds a speculative home, he is responsible for paying its mortgage and expenses until it sells.

[3]Gordon opined that "[y]ou couldn't please [Crews], regardless of what you did."

[4]This cause was assigned number 141-184797-00.

2

3. *[Gordon] shall deliver to [Crews's] attorney a sworn, true and correct personal financial statement that shows he is judgment proof on or before 4:00 PM August 4, 2003.* [Crews] has been induced to enter into this agreement to settle a disputed claim for a lesser amount than she thinks is appropriate based upon and in reliance upon [Gordon's] sworn, true and correct, financial statements.

4. [Gordon] and [Crews] shall enter into a real estate sales contract that provides that [Gordon] shall purchase [Crews's] home in question (home) for 91% of its appraised value . . . . The closing of the home sale (home closing) [shall] be within 60 days of written notice by [Crews] . . . . The written notice from [Crews] to [Gordon] shall be on or before July 28, 2008 . . . .

. . . .

[6]. Each party hereby releases the other party from all claims, known or unknown, for and in consideration of this Compromise and Settlement, except as provided herein. The release includes . . . legal representatives. . . .

[Gordon's attorney] shall prepare the . . . forms . . . and such other documents needed to accomplish this agreement . . . .

. . . .

Closing shall occur on or before 5:00 o'clock p.m. on August 28, 2003 . . . . Closing is the event at which executed documents and funds are actually exchanged to complete this Agreement. The delivery of all documents, fully executed by the parties, and the funds to be delivered are to be done on or before the closing date. . . .

THIS AGREEMENT IS NOT SUBJECT TO REVOCATION [Emphasis added.]

In accordance with the CSA, Gordon submitted his first financial statement to Crews on August 1, 2003, several days before the August 4, 2003 deadline. The statement identified Gordon's net worth as negative $340,050, and he

3

signed the statement under the following verification: "I hereby affirm that the above information is true and correct to the best of my knowledge, information and belief." But Crews "was not happy with" the statement and asked that Gordon submit a new financial statement, which he agreed to do.[5]

Gordon submitted a second financial statement on August 4, 2003, that identified his net worth as approximately negative $474,000 and included the same declaration found in the first financial statement above his signature. Unlike the first financial statement, the second financial statement included information about his ownership in several entities and the assets that those entities held in banks, a breakdown of his credit card debt, a house (704 Montreux) that he sold the same day of the mediation, two lots that he owned in Austin, and several additional liabilities. Although Crews acknowledged that the second financial statement contained more detail than the first financial statement, she was not satisfied with the statement; she considered it insufficient; she asked for more information; and on August 25, 2003, she requested that Gordon submit a financial statement using a particular form. Gordon agreed, again.

---

[5]The first financial statement listed the figures associated with several of Gordon's assets and liabilities, including "Cash in Bank," "Homestead," "Automobiles," and, among other things, "Loans Payable to Bank," but Crews opined that the statement was incomplete and untrue because none of the information contained therein was independently verifiable. For example, Crews was unable to tell from the statement what bank held Gordon's cash, what the physical address of Gordon's homestead was, what the details were regarding the loans payable to the bank, and so on.

Gordon submitted a third financial statement to Crews on August 29, 2003, using the form provided by Crews. The statement contained even more information about Gordon's financial condition, identified his net worth as approximately negative $547,000, and included a verification that the financial information contained therein was "a true, complete[,] and correct statement of [his] financial condition." But Crews took issue with the statement again and requested that it be modified to include additional information, including details regarding Gordon's community property, assets held in his children's names, and tax returns, among other things. Although Gordon thought that Crews's latest request was "changing the rules" because "[n]one of [it] was discussed in the settlement agreement," he agreed to submit additional information to Crews regarding tax returns and credit card statements.

As with the three previous financial statements, Crews was yet again dissatisfied with the additional financial information that Gordon submitted, and she requested that he provide "the completed financial statement, including all community property." But this time, Gordon refused to provide any additional information. Crews consequently filed a "Motion to Enforce Mediation Settlement," which the trial court granted, ordering Gordon to turn over information about his ownership interests in separate and community property.[6]

---

[6]The trial court ordered that the information be considered part of the third financial statement.

On February 24, 2004, Gordon submitted supplemental financial information to Crews in accordance with the trial court's order. The documents showed that Gordon had a net worth of approximately negative $597,000. Crews did not request any additional financial information thereafter, and the parties worked to finalize formal settlement documents. Gordon's insurance company sent a settlement check payable to Crews in September 2003 for $33,000 and a replacement check for the same amount in June 2004. After Gordon objected to several parts of Crews's version of the proposed final settlement agreement, Crews withdrew her consent to the CSA.

In August 2005, Gordon filed his original counterclaim against Crews for breach of the CSA, alleging that he had fully performed under the enforceable CSA but that Crews had refused to execute formal settlement documents and to release him from liability. The trial court severed all claims related to the CSA from Crews's suit against Gordon (cause 141-184797-00) and abated Crews's suit.[7]

A jury trial commenced in June 2009 on the CSA-related claims. The jury found that the CSA was a legally enforceable agreement between Crews and Gordon, that Gordon did not fail to comply with the CSA, that Crews did fail to comply with the CSA, and that Crews was not fraudulently induced by Gordon to enter into the CSA. The trial court signed an amended final judgment ordering

---

[7]The trial court assigned the severed cause 141-231935-08. Crews pleaded the affirmative defense of fraudulent inducement.

that Gordon "is entitled to a judgment on his breach of settlement agreement claim seeking enforcement of July 28, 2003 [CSA]." In light of the judgment in the CSA-related suit, the trial court granted Gordon's subsequent motion for summary judgment on Crews's abated claims in cause 141-184797-00, regarding the construction of her house, ordering that "all claims and causes of action between the parties are dismissed with prejudice and that [Crews] take nothing by way of her causes of action herein." Crews appeals.

## III. STANDARDS OF REVIEW

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). Anything more than a scintilla of evidence is legally sufficient to

7

support the finding. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996); *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex. 2002). If a party is attacking the legal sufficiency of an adverse finding on an issue on which the party had the burden of proof, she must demonstrate that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

### IV. GORDON'S COMPLIANCE WITH THE CSA

In her first and second issues, Crews argues that the evidence is legally and factually insufficient to support the jury's finding that Gordon complied with the CSA.[8] Crews contends that instead of submitting a sworn, true, and correct

---

[8]Crews does not challenge the jury's finding that the CSA constituted a legally enforceable agreement between her and Gordon.

8

financial statement as required by the CSA, Gordon "flat out lied to [her] throughout the whole process of providing her with his sworn, true[,] and correct financial statements" because the first financial statement did not contain any information regarding 704 Montreux and the two lots that Gordon owned in Austin, the statements failed to list additional debts and assets, and Gordon admitted to lying in applications that he submitted to Affiliated Bank.

At the heart of Crews's first and second issues is a dispute about what is material and what is not material to Gordon's compliance with the CSA. Jury question number 2 specifically addressed materiality, stating in relevant part the following:

> [Gordon's] failure to comply, if any, *must be material*. The circumstances to consider in determining whether a failure to comply is material include:
>
> (a)    the extent to which [Crews] will be deprived of the benefit which she reasonabl[y] expected;
>
> (b)    the extent to which [Crews] can be adequately compensated for the part of that benefit of which she will be deprived;
>
> (c)    the extent to which [Crews] will suffer forfeiture;
>
> (d)    the likelihood that [Gordon] will cure his failure, taking into account the circumstances including any reasonable assurances;
>
> (e)    the extent to which the behavior of [Gordon] comports with standards of good faith and fair dealing. [Emphasis added.]

*See Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 199 (Tex. 2004) (listing factors of Restatement (Second) of Contracts § 241(a) (1981) in determining materiality of breach).

Gordon testified that one of the "big" issues addressed at the mediation on July 28, 2003, was his financial situation because Crews wanted to know what his "ability to pay was." Crews testified similarly—that Gordon's financial condition was one of the "main issues" discussed at the mediation. In light of the significance of Gordon's financial condition, Crews and Gordon included the provision in the CSA requiring that Gordon submit a sworn, true, and correct financial statement showing that he was judgment proof and affirming that Crews was induced to enter into the CSA for a lesser amount than she thought appropriate based upon Gordon's financial statements evidencing that he was judgment proof. Crews acknowledged at trial that for Gordon to comply with the CSA, the financial statement that he submitted had to establish that he had a negative net worth and not a positive net worth.[9] Gordon testified that he was

---

[9]The following exchange occurred between Crews and her attorney:

    Q.    If you got a financial statement from [Gordon] that showed that he was worth $500,000, positive net worth, that would not have complied with this agreement, would it?

    A.    No.

    Q.    The sworn, true, and correct financial statement had to establish that he had a negative net worth, right?

    A.    That's correct.

10

"judgment proof" so long as his liabilities exceeded his assets; or as Crews stated, that he had a negative net worth. Considering this evidence, the jury could have concluded—and likely did conclude—that it was material to Gordon's compliance with the CSA that he submit a financial statement evidencing his negative net worth.

Gordon testified that the third financial statement, twice supplemented with additional financial information (ordered once by the trial court), was the most accurate and detailed of the three financial statements that he submitted to Crews; that it truly, correctly, and accurately reflected that he had a negative net worth of $597,000; and, therefore, that he was judgment proof as of July 28, 2003.[10] Gordon testified extensively about the details and figures set forth in the third financial statement, establishing its accuracy, and the trial court admitted numerous exhibits supporting Gordon's uncontroverted testimony that he had a negative net worth on July 28, 2003.[11]

Crews's arguments highlighting Gordon's failure to include certain information in his financial statements impliedly assert that those exclusions were

[10]Crews agreed that the appropriate calculation of Gordon's net worth was as of July 28, 2003, and not at any time thereafter. Crews does not argue that Gordon submitted the third financial statement untimely.

[11]Among other things, Gordon testified and offered exhibits about balances that he held in bank accounts at relevant time periods, funds that he withdrew from his retirement account to pay subcontractors, money that he owed to different institutions, his homestead, his partial ownership in real property and the debts associated therewith, his numerous contingent liabilities, tax returns, and past and pending lawsuits.

11

material to his compliance with the CSA. The arguments closely track Crews's testimony agreeing that "every single thing in the financial statement had to be absolutely correct for [Gordon] to comply with the settlement, *even if the error made didn't result in [Gordon] having a positive net worth*." [Emphasis added.] However, Crews was not charged with determining the materiality of a failure to comply with the CSA; the jury was charged with that responsibility. Accounting for the circumstances that the jury was charged with considering in determining whether a failure to comply was material, the jury could have determined—and apparently did so determine—that Gordon's failure to include information in his first financial statement about 704 Montreux and the two lots in Austin, and his failure to include in the financial statements more detailed data about assets and liabilities that he had already identified, were not material to whether he complied with the CSA because the inclusion of the omitted financial information would not have resulted in Gordon ever having a positive net worth—an issue that *was* material to Gordon's compliance with the CSA. Instead, the complained-of omitted financial information, which was all included in the third, supplemented financial statement, merely *increased* the extent of Gordon's negative net worth.

Crews further argues that the jury could not have found that Gordon complied with the CSA because he lied to her by excluding information on the financial statements and because he submitted financial statements to Affiliated Bank that contained false information. Attacking Gordon's credibility, Crews contends that Gordon "should not be able to come into court, admit that he

12

intentionally left information out of a series of financial statements[,] . . . and enjoy the protection of the [j]ury's verdict in this case." Crews's arguments disregard the jury's province in determining witness credibility, erroneously substituting her opinion of Gordon's credibility for that of the jury. *See City of Keller*, 168 S.W.3d at 819. Gordon explained that he did not include the information about 704 Montreux and the two lots that he owned in Austin on his first financial statement because "it was a terrible time"; he was "[t]rying to survive, jocking around money, changing offices, office managers, reducing the size of the office each time and people. I had a young child, you know, a lot of things." Regarding the financial statements that he submitted to the bank, Gordon testified that he excluded debt and inflated several assets on the financial statements because he needed loans to pay off debt that he had incurred to banks, subcontractors, lienholders, and suppliers. Gordon admitted that what he had done was wrong, but he explained that he had repaid his creditors and the bank with interest and that the same bank had loaned him money again. The jury was free to conclude that Gordon was no less credible—and, therefore, that he had complied with the CSA by submitting a sworn, true, and correct financial statement showing that he had a negative net worth on July 28, 2003—notwithstanding his omission of information in the financial statements that he submitted to Crews and his admitted actions regarding the unrelated financial statements that he submitted to the bank.

13

Crews also argues that Gordon overstated the amount of his liabilities by $503,500 because he counted certain liabilities twice. Of the approximately $500,000, Crews argues that Gordon overstated liabilities in the amount of $471,000 because he counted liabilities totaling that figure in the financial statements that he submitted to Crews and in the HUD-1 settlement statement for the "1803 Leeds" property. However, Crews raised this issue at trial, and the jury rejected it. Gordon testified that he did not sell the 1803 Leeds property until nine months *after* he and Crews had entered into the CSA, which was at a point in time that was irrelevant to his net worth as of July 28, 2003, and that he had paid additional debts that were attributable to the Leeds property but that were not listed on the Leeds statement. Moreover, even if the jury agreed with Crews's argument, Gordon still had a negative net worth.

Viewing the evidence under the appropriate standards of review, we hold that the evidence is both legally and factually sufficient to support the jury's finding that Gordon complied with the CSA. *See id.* at 802, 807, 827; *Pool*, 715 S.W.2d at 635; *Garza*, 395 S.W.2d at 823. Accordingly, we overrule Crews's first and second issues.

## V. CREWS'S COMPLIANCE WITH THE CSA

In her third and fourth issues, Crews argues that the evidence is legally and factually insufficient to support the jury's finding that she failed to comply with the CSA. Crews argues that her obligation under the CSA to release Gordon from all claims was subject to him submitting to her a sworn, true, and correct

14

financial statement, which Gordon failed to do, and that she was not obligated to sign *another* release for Gordon because the CSA itself operated to release Gordon and his insurance company.

We have already held above that the evidence is legally and factually sufficient to support the jury's finding that Gordon complied with the CSA. Thus, in line with Crews's argument, she had an obligation under the CSA to release Gordon "from all claims, known or unknown," but she admittedly did not do that. Crews testified that in April 2004, she decided that she did not want to go through with the CSA and that she authorized her attorney "to withdraw [her] consent" to the CSA. Indeed, Crews subsequently filed an amended petition in the suit involving the claims related to the construction of her house instead of dismissing that suit, and she did not execute the formal settlement documents, even though the CSA expressly contemplated that she do so. Crews's argument that she was not obligated to sign another release is without any merit because she unequivocally repudiated the CSA, which also required her and Gordon to exchange fully executed documents in order to "complete" the CSA.

Viewing the evidence under the appropriate standards of review, we hold that the evidence is both legally and factually sufficient to support the jury's finding that Crews failed to comply with the CSA. *See City of Keller*, 168 S.W.3d at 802, 807, 827; *Pool*, 715 S.W.2d at 635; *Garza*, 395 S.W.2d at 823. Accordingly, we overrule Crews's third and fourth issues.

15

## VI. FRAUDULENT INDUCEMENT

In her fifth and sixth issues, Crews argues that the evidence is legally and factually insufficient to support the jury's finding that she was not fraudulently induced by Gordon to enter into the CSA. Crews contends that the jury "should have found an intent on the part of [Gordon] to fraudulently induce [Crews] into entering into" the CSA because (1) Gordon never performed his obligation to provide her with a true and correct financial statement but instead filed four financial statements, each containing more information than the previously submitted statement, and (2) Gordon submitted a false financial document to obtain a loan from Affiliated Bank.

Crews bore the burden of proving her fraudulent inducement affirmative defense. *See Garner v. Fidelity Bank, N.A.*, 244 S.W.3d 855, 861 (Tex. App.—Dallas 2008, no pet.) (stating that party asserting affirmative defense bears the burden of proving its elements). We have already held that the evidence is legally and factually sufficient to support the jury's finding that Gordon complied with the CSA by submitting a sworn, true, and correct personal financial statement to Crews showing he was judgment proof on July 28, 2003, and the jury chose to accept Gordon's testimony as credible even though he admitted to filing a false financial statement with Affiliated Bank. Crews has not established, as a matter of law, all vital facts in support of her fraudulent inducement affirmative defense, nor is the jury's failure to find that Gordon fraudulently induced her to enter into the CSA so weak, or so contrary to the overwhelming

16

weight of all the evidence, that the answer should be set aside and a new trial ordered. *See Dow Chem. Co.*, 46 S.W.3d at 242; *Pool*, 715 S.W.2d at 635; *Garza*, 395 S.W.2d at 823. Accordingly, we hold that the evidence is legally and factually sufficient to support the jury's finding that Crews was not fraudulently induced by Gordon to enter into the CSA. We overrule Crews's fifth and sixth issues.

## VII. APPEAL OF SUMMARY JUDGMENT IN CAUSE 02-09-00413-CV

The trial court granted Gordon's motion for summary judgment on Crews's claims regarding the construction of her house in cause 141-184797-00 (appeal cause 02-09-00413-CV). Crews concedes that "[i]f Appeal No. 02-09-00414-CV [cause 141-231935-08] is rejected by the Court of Appeals, Appeal No. 02-09-00413[-CV] is frivolous." She asserts no other arguments. Because we have overruled each of Crews's issues in cause 02-09-00414-CV, we overrule any challenge that Crews makes to the summary judgment granted in cause 141-184797-00.

## VIII. CONCLUSION

Having overruled each of Crews's issues, we affirm the trial court's judgment and its order.

BILL MEIER
JUSTICE

PANEL: DAUPHINOT, MEIER, and GABRIEL, JJ.

DELIVERED: June 9, 2011

17